2002 ME 172

**Donald J. WILLIAMS,**

v.

**STATE TAX ASSESSOR.**

Supreme Judicial Court of Maine.

Argued: Nov. 13, 2002.
Decided: Dec. 10, 2002.

Alfred C. Frawley, Esq., Roy T. Pierce, Esq. (orally), Preti Flaherty Beliveau

Pachios & Haley, LLC, Portland, ME, for plaintiff.

G. Steven Rowe, Attorney General, Thomas A. Knowlton, Asst. Attorney General (orally), Augusta, ME, for defendant.

Jonathan A. Block, Esq., Pierce Atwood, Portland, ME, for amicus curiae, Maine Society of Certified Public Accountants.

Panel: SAUFLEY, C.J., and CLIFFORD,* RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

RUDMAN, J.

[¶ 1] Donald Williams appeals from the judgment entered in the Superior Court (Kennebec County, *Marden, J.*) affirming the State Tax Assessor's decision to assess additional income tax liability against Williams for the 1988 tax year. Contrary to Williams's contentions, the Superior Court erred neither by concluding that 36 M.R.S.A. § 141 (1990 & Supp.2001) permits the Assessor to audit the federal adjusted gross income figure used in calculating Maine taxable income, nor by ruling that Williams could not deduct "contingent" liabilities in arriving at his 1988 federal adjusted gross income.[1] We therefore affirm the judgment.

## I. CASE HISTORY

[¶ 2] Donald Williams was the sole shareholder of D.J. Williams, Inc. (DJW). DJW, in turn, was the sole shareholder of four corporate subsidiaries, including Doran–Maine, Inc. (Doran), a Maine corporation that manufactured concrete in Leeds.

[¶ 3] In the fall of 1988, DJW instituted a plan to completely liquidate its operating assets, including its four subsidiaries. As part of this plan, Doran sold nearly all of its assets to Northeastern Culvert, Inc. in October 1988. In late October and early November 1988, Northeastern informed Doran that it had not performed certain actions required to be performed by it under the terms of the parties' purchase and sale agreement. Northeastern specifically alleged that Doran failed to deliver agreed-upon items, to attend to asbestos problems, and to clean up the Leeds site. Northeastern threatened to file a lawsuit for fraud and demanded Doran pay $100,000 as compensation for these deficiencies. Doran and Northeastern eventually settled this dispute for $46,500 in April 1989.

[¶ 4] In early 1989, Williams asked his accountant to prepare the federal corporate income tax return (form 1120) for DJW, as well as his 1988 federal personal income tax return (form 1040). His accountant thereafter advised Williams that he had personally incurred a capital gain of $1,137,453, with a total federal income tax liability of $513,087 as a result of DJW's liquidation. After receiving this information, Williams determined that the liabilities arising from the liquidation were $556,800 higher than previously estimated, primarily due to the potential legal dispute between Northeastern and Doran. His accountant adjusted DJW's form 1120 and Williams's form 1040 to reflect the liability increase, which reduced Williams's previously estimated capital gain.

---

* Although not available at oral argument, Justice Clifford participated in this opinion. *See* M.R.App. P. 12(a) (stating that a "qualified justice may participate in a decision even though not present at oral argument").

1. Williams also joins in the argument, first raised in an amicus curiae brief filed by the Maine Society of Certified Public Accountants, that 36 M.R.S.A. § 151 (Supp.2001) allows taxpayers to raise an issue in the Superior Court even if they fail to preserve the issue at the agency level. Because Williams did, in fact, preserve all issues at the agency level, we need not address the merits of this argument.

[¶ 5] Williams's accountant completed the federal tax returns for Williams and DJW by April 15, 1989, but the returns were not filed until January 1993. DJW's final corporate income tax return indicated that Williams personally received $469,128 as a result of the corporation's liquidation. Williams reported this distribution on his 1988 federal income tax return, deducted his $10,000 cost basis in the capital stock of DJW, and reported a taxable capital gain of $459,128. Williams added this capital gain to other income he received in 1988 to arrive at a federal adjusted gross income of $1,217,729.

[¶ 6] In July 1995, before Williams filed his 1988 state tax return, the State Tax Assessor instituted an audit, pursuant to 36 M.R.S.A. § 141, to determine Williams's state income tax liability for 1988. With the audit pending, Williams filed his state tax return. He reported a federal adjusted gross income of $1,100,994, which included the $459,128 in capital gain from the liquidation of DJW.[2]

[¶ 7] After reviewing Williams's tax returns, the Maine Revenue Service discovered that Williams had underreported his capital gain from DJW's liquidation because he improperly claimed $556,800 in contingent liabilities from the potential legal dispute between Doran and Northeastern. Pursuant to section 141, the Assessor instituted a supplemental audit in May 1998 to determine the propriety of the $556,800 deduction for contingent liabilities.[3] As a result of this audit, the deduc-

tion was disallowed and Williams was charged an additional $129,205 in tax, interest, and penalties.

[¶ 8] In June 1998, Williams filed a petition for reconsideration of the supplemental audit, pursuant to 36 M.R.S.A. § 151. The Assessor subsequently upheld the supplemental audit in all respects. In December 1999, Williams filed a six-count 80C appeal in the Superior Court for judicial review of the Assessor's decision. M.R. Civ. P. 80C. The Assessor thereafter filed a motion for a summary judgment. The Superior Court granted the Assessor's motion and affirmed the Assessor's decision at the hearing on reconsideration. Williams filed a timely appeal.

## II. DISCUSSION

### A. Standard of Review

[¶ 9] "We review a trial court's grant of a motion for a summary judgment for errors of law and independently examine the parties' statements of material facts to determine if a genuine issue of material fact exists." *White v. McTeague, Higbee, Case, Cohen, Whitney & Toker, P.A.,* 2002 ME 160, ¶ 6, 809 A.2d 622. When specifically evaluating the Superior Court's review of State Tax Assessor decisions, we consider the court's determinations of law de novo, *J & E Air, Inc. v. State Tax Assessor,* 2001 ME 95, ¶ 6, 773 A.2d 452, 454, and its findings of fact for clear error, *Koch Ref. Co. v. State Tax*

---

**2.** A resident taxpayer reports his or her federal adjusted gross income because state "taxable income" is defined as that "individual's federal adjusted gross income as defined by federal law, with the modifications, and less the deductions and personal exemptions" provided by the state's specific taxation scheme. 36 M.R.S.A. § 5121 (Supp.2001).

**3.** Section 141 authorizes the Assessor to "conduct such audits or investigations as he be-

lieves necessary to determine the correct tax liability." 36 M.R.S.A. § 141. During the supplemental audit, the Assessor interpreted section 141 to allow him to determine the legally correct federal adjusted gross income when a taxpayer mistakenly or fraudulently reports an erroneous figure. The Assessor, therefore, disallowed Williams's deduction pursuant to this power.

*Assessor*, 1999 ME 35, ¶ 8 n. 5, 724 A.2d 1251, 1254.

### B. State Tax Assessor's Authority

■ [¶ 10] Title 36 M.R.S.A. § 5121 (Supp.2001) defines a resident. taxpayer's "taxable income" as that "individual's federal adjusted gross income *as defined by federal law* ...." (emphasis added). Williams contends that the Assessor was required to assess his state income tax liability based on the federal adjusted gross income figure he reported on his 1988 tax return, and that the Assessor exceeded the bounds of his statutory authority by disallowing a deduction he had taken in arriving at his 1988 federal adjusted gross income. We disagree.

[¶ 11] Our Legislature has defined the Assessor's audit powers broadly. Title 36 M.R.S.A. § 141 provides:

> When a return is filed, the State Tax Assessor shall cause it to be examined and may conduct such audits or investigations *as he believes necessary* to determine the correct tax liability. If he determines that the amount of tax shown on the return is less than the correct amount, the State Tax Assessor shall assess the tax due the State.

36 M.R.S.A. § 141 (emphasis added). The statute's plain language contains no express or implied limitations on the Assessor's audit powers. *See Prue v. Prue*, 420 A.2d 257, 259 (Me.1980) (observing "an authorizing statute grants both powers that may reasonably be inferred from those expressly granted and also powers essential to give effect to those expressly granted").

[¶ 12] Our Legislature further strengthened the Assessor's audit authority after enacting section 141 by specifically authorizing the review of a taxpayer's records and place of business. *See* 36 M.R.S.A. § 112(4) (Supp.2001) (originally enacted by P.L.1981, ch. 364, § 7) ("Whenever necessary to the administration of [Title 36], the assessor may make, or cause to be made by an employee, an examination or an investigation of the place of business, books and other documents and any other relevant personal property of any person who the assessor has reason to believe is liable for any tax imposed by this Title.").

[¶ 13] The Assessor's audit power includes the authority to interpret the applicable federal tax provisions and ensure that the taxpayer reports a federal adjusted gross income figure that comports with federal law.[4] *See* 36 M.R.S.A. §§ 141, 5121. Section 5121 expressly requires a taxpayer to report a legally accurate federal adjusted gross income. 36 M.R.S.A. § 5121. Interpreting section 5121 to require the Assessor to accept the federal adjusted gross income figure *as reported* on the taxpayer's state return would contradict section 5121's express language in cases when that figure is contrary to federal law.[5] Moreover, such an interpreta-

---

**4.** This conclusion is in accord with other jurisdictions extending such authority to tax assessors. *E.g., Maxitrol Co. v. Dep't of Treasury*, 217 Mich.App. 366, 551 N.W.2d 471, 473–74 (1996) (holding the state tax assessor has the authority to assess the validity of the taxpayer's claimed federal deductions because the deductions directly affected the taxpayer's Michigan income tax liability); *Specktor v. Comm'r of Revenue*, 308 N.W.2d 806, 808 (Minn.1981) (holding the state tax commis-

sioner has the authority to bring a taxpayer's reported federal adjusted gross income into compliance with federal law notwithstanding the federal government's failure to make a similar adjustment).

**5.** Williams cites *Tiedemann v. Johnson*, 316 A.2d 359, 364–65 (Me.1974) for the proposition that the Assessor may not deviate from the reported federal adjusted gross income figure. His reliance, however, is misplaced. In *Tiedemann*, the taxpayers reported a feder-

tion would unduly restrict the Assessor's audit powers and render him powerless to correct a fraudulent or erroneously reported federal adjusted gross income figure. Accordingly, the Superior Court did not err in allowing the Assessor to audit the federal adjusted gross income figure used in calculating Maine taxable income.

## C. Deduction for Contingent Liabilities

■ [¶ 14] Williams next contends the Superior Court improperly granted the Assessor's motion for a summary judgment concerning the deduction of contingent liabilities. We disagree.

[¶ 15] When a corporation liquidates, a shareholder may deduct only those liabilities that are known at the time of liquidation from the fair market value of the assets received. *See* Rev. Rul. 59–228, 1959–2 C.B. 59 (stating that shareholders can reduce the actual value of assets they received upon corporate dissolution by the present value of known irrevocable pensions). Shareholders, therefore, may not reduce their gains by contingent liabilities during the year of liquidation. *See* Rev. Rul. 72–137, 1972–1 C.B. 101; *see also United States v. Gen. Dynamics Corp.*, 481 U.S. 239, 243–44, 107 S.Ct. 1732, 95 L.Ed.2d 226 (1987). Rather, such contingent liabilities are deductible only in the year the contingency is discharged. *See*

Rev. Rul. 72–137, 1972–1 C.B. 101; *see also Dixie Pine Prods. Co. v. Comm'r*, 320 U.S. 516, 519, 64 S.Ct. 364, 88 L.Ed. 270 (1944).

[¶ 16] The record indicates that the $556,800 liability comprised expenses contemplated to be incurred in the resolution of a dispute emanating from the purchase and sale agreement between Doran and Northeastern. In January 1989, Northeastern threatened to file a lawsuit and demanded $100,000 as compensation for alleged breaches of the contract. In response, Williams gave his accountant a list of expenses totaling $556,800, to be incurred in the resolution of this *potential* dispute.

■ [¶ 17] Any potential liabilities arising from the dispute with Northeastern were contingent—and, therefore, not deductible—until April 18, 1989, when Doran paid Northeastern $46,500 to release its demands. *See Dixie Pine Prods. Co.*, 320 U.S. at 519, 64 S.Ct. 364. The $46,500 settlement, however, was only deductible in 1989, the year in which the liability was discharged. *See* Rev. Rul. 72–137, 1972–1 C.B. 101. Accordingly, the Superior Court properly upheld the Assessor's decision to deny the $556,800 deduction for contingent liabilities in the 1988 tax year.[6]

---

al adjusted gross income on their state return lower than the figure they reported on their federal return based on the exclusion of certain gains from the sale of a house permitted under the Maine Income Tax Code. *Tiedemann*, 316 A.2d at 361–62. We upheld the Assessor's assessment of a tax deficiency because section 5121 defines state taxable income as the taxpayer's legally correct federal adjusted gross income, and federal law did not allow the taxpayer to exclude the gains. *Id.* at 364–65. Because we focus here on the Assessor's authority to adjust a taxpayer's reported federal adjusted gross income when it does not comport with federal law, *Tiedemann* is inapplicable.

6. Williams also argues that the Superior Court erred by failing to consider whether he was entitled to deduct additional contingent liabilities that he did not originally deduct on his 1988 state tax return. Assuming, arguendo, that the Superior Court should have considered the merits of this additional deduction, the error was harmless because the additional liabilities were contingent and, therefore, not deductible when DJW liquidated in 1988. See Rev. Rul. 72–137, 1972–1 C.B. 101; *see also Dixie Pine Prods. Co.*, 320 U.S. at 519, 64 S.Ct. 364.

[¶ 18]   Williams's other contentions do not merit comment.

The entry is:

Judgment affirmed.